# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PATRICIA WHITEHORN,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 14 C 2037

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Whitehorn filed this action seeking reversal of the final deci-
sion of the Commissioner of Social Security denying her application for Disability
Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C.
§§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United
States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for
summary judgment. For the reasons stated below, the case is remanded for further
proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that
he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20
C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that
used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th
Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on October 14, 2009, alleging that she became disabled on November 6, 2008, due to arthritis, sarcoidosis (a disorder characterized by tiny clusters of inflammatory cells, often in the lungs), and knee problems. (R. at 18, 202, 221). The application was denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 81, 82, 119–20). On March 28, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 86, 762–89). The ALJ also heard testimony from Richard J. Hamersma, a vocational expert (VE). (*Id.*). The ALJ denied Plaintiff's request for benefits on April 7, 2011. (*Id.* at 86–99). Plaintiff filed a timely request for review of the ALJ's decision, and on May 21, 2012, the Appeals Council vacated the April 2011 decision and remanded the case for further proceedings. (*Id.* at 100–105). On December 5, 2012, Plaintiff, represented by counsel, testified at another hearing before the ALJ. (*Id.* at 18, 44, 49–52, 68–71). The ALJ also heard testimony from Margaret H. Ford, a VE. (*Id.* at 44, 52–68, 71–79, 200–01).

The ALJ again denied Plaintiff's request for benefits on January 2, 2013. (R. at 18–32). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 6, 2008. (*Id.* at 20). At step two, the ALJ found that Plaintiff's arthropathies and sarcoidosis are severe impairments. (*Id.* at 20–21). At step three, the ALJ determined that Plaintiff does not have an impairment or combina-

tion of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 21–22).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC) and determined that Plaintiff has the RFC to

> lift and carry 10 pounds occasionally and 10 pounds frequently, and can be on her feet standing/walking about 2 hours in an 8-hour workday with normal rest periods and sit about 6 hours, with normal rest periods. She is unable to work at heights, climb ladders, or frequently negotiate stairs. She should avoid concentrated exposure to fumes, dust, odors, gases or poorly ventilated areas. She would be off task 10 percent of the time.

(R. at 22). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (*Id.* at 29). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the local economy that Plaintiff can perform, including information clerk and receptionist. (*Id.* at 30–31). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 31–32).

The Appeals Council denied Plaintiff's request for review on January 29, 2014. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has a history of degenerative joint disease in both knees, which was treated by Kathleen Weber, M.D., with cortisone injections in 2005 and 2007 (R. at 318–20). In 2008, her knee pain was worsening, especially in the right knee. (*Id.* at 322). X-rays showed extensive tricompartmental arthritis and "very extensive bone on bone osteoarthritis." (*Id.* at 314–15). Dr. Weber opined that Plaintiff would be a candidate for viscosupplementation (injection of a lubricating fluid called hyaluronic acid) and possible knee replacement surgery in the future. (*Id.* at 323). That day, Dr. Weber aspirated fluid from her right knee, treated both knees with cortisone injections, and gave her a new prescription for Celebrex. (*Id.* at 322, 383–84). A month later, in March 2008, when she felt about 65% better but the steroid was starting to wear off, Dr. Weber injected hyaluronic acid in both knees. (*Id.* at 381–382). According to primary care treatment records, Plaintiff also experienced episodic low back pain in 2007 and 2008. (*Id.* at 523 (Feb. 2, 2007), 538 (Jan. 30, 2008)).

Orthopedic surgeon Craig Della Valle, M.D., performed knee replacement surgery on her right knee on November, 2008. (R. at 449–52). Following the surgery, Plaintiff attended 19 physical therapy appointments between December 2008 and March 2009. (*Id.* at 491–96). Her stated goals for therapy included being able to step up and down from a 14-inch step so she could travel by bus, and being able to stand and walk for 30 minutes consistently, both with the aim of returning to her job. (*Id.* at 493–94). She was discharged from physical therapy on March 2, 2009, reportedly having achieved her goals, in order to have surgery on the other knee. (*Id.* at 495).

Dr. Della Valle performed knee replacement surgery on her left knee on March 9, 2009. (R. at 296–98). From May 22 through July 10, 2009, she again received physical therapy, attending 12 appointments and missing none, until she reached her maximum number of authorized visits and was discharged to a home exercise program. (*Id.* at 496–99). She had not yet met her goals of reducing her pain by 50% and increasing her lower extremity strength to 5/5, but she was "improving" in her ability to walk. (*Id.* at 499).

Throughout this period Plaintiff also had regular visits with her orthopedic surgeon, Dr. Della Valle, who completed several progress reports for Plaintiff's state disability insurer. In May 2009, Dr. Della Valle opined that she would be unable to return to work until June 9, 2009. (R. at 405). On June 19, he opined that she could not return to work until undergoing a functional capacity evaluation (FCE) to be

scheduled on the completion of her physical therapy on July 10.[2] (*Id.* at 409). In late July, he noted that Plaintiff had "chosen not" to undergo the FCE (*id.* at 410) and opined that she had been able to return to work at the medium exertion level as of June 9, 2009, with only the following restrictions: no lifting over 50 pounds, no kneeling if painful, no running, and no jumping (*id.* at 412). On August 5, 2009, he opined that her date released to work was "undetermined" and noted that Plaintiff was scheduling the needed FCE. (*Id.* at 415).

In a Physical RFC Questionnaire completed on December 1, 2009, Dr. Della Valle reported that he had last seen Plaintiff on July 28. (R. at 419). He opined that her symptoms did not last, nor were they expected to last, more than twelve months, and that she had been able to return to work, performing light work on a full-time basis, as of June 9, 2009. (*Id.* at 419–20). She would not miss work due to her impairment, and could sit for six hours or stand and walk for six hours in an eight-hour work day. (*Id.*). He stated that his opinions regarding Plaintiff's abilities were estimated, as Plaintiff had refused to undergo the FCE that was recommended as of June 9, 2009. (*Id.* at 420).

---

[2] A functional capacity evaluation, performed either by a physician or by a physical or occupational therapist, is "a battery of physical tests that assesses whether an injured employee is able to return to work and in what capacity." *Goetzke v. Ferro Corp.,* 280 F.3d 766, 770 (7th Cir. 2002). An FCE is frequently used to determine a claimant's continued eligibility for benefits under private long-term disability. *See, e.g. Holmstrom v. Metropolitan Life Insurance Co.,* 615 F.3d 758, 763–64 (7th Cir. 2010); *see generally* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2150654/; http://www.aota.org/about-occupational-therapy/professionals/wi/capacity-eval.aspx (websites last visited Mar. 15, 2016).

On December 22, 2009, Plaintiff reported that her right knee was at about 80% of normal but her left knee was only 25%. (R. at 390). Dr. Della Valle gave her a continued prescription for Lidoderm patches, which had been helpful in treating the pain. (*Id.* at 570).

In a Function Report of January 22, 2010, Plaintiff reported that she can prepare simple meals, wash dishes, and do laundry and ironing, except she needs help carrying the clothes downstairs. (R. at 240). Her sister helps her with other cleaning. (*Id.*). She gets out of breath after 10–15 minutes of walking and cannot kneel or squat at all. (*Id.* at 243). She is unable to carry groceries or take out the trash due to shortness of breath, back pain, and knee pain. (*Id.* at 247). Back pain also causes trouble with reaching overhead. (*Id.* at 247). She can sit for two hours but usually lies down afterwards. (*Id.* at 248).

On February 9, 2010, Plaintiff visited Steven K. Rothschild, M.D., at Rush University Family Physicians, complaining of chronic back pain, bilateral hip pain, and fatigue. (R. at 620). Her back pain was described as spasms, controlled with Flexeril, topical Lidoderm patches, and ibuprofen. Her hip pain, of more recent origin, consisted of stiffness and intense pain after prolonged sitting. (*Id.*). An X-ray of her hips revealed only mild degeneration. (*Id.* at 632–33). She also requested a refill of the albuterol inhaler she used three to four time daily to treat her sarcoidoisis. (*Id.* at 620).

On February 18, 2010, consultative examiner Liana G. Palacci, D.O., examined Plaintiff and prepared a report. (R. at 593–96). She noted that Plaintiff complained

of pain in her knees, left worse than right, exacerbated by walking and by climbing stairs. (*Id.* at 593–94). Her left knee had mild swelling and was warm to the touch, but her range of motion was normal. (*Id.* at 595). She could walk 50 feet unassisted but needed a cane beyond that. (*Id.*).

On March 4, 2010, Young-Ja Kim, M.D., reviewed Dr. Palacci's report and opined that Plaintiff has the RFC to lift or carry ten pounds occasionally but less than ten pounds frequently; to stand and/or walk for at least two hours in an eight-hour workday; and to sit for about six hours in an eight-hour work day. (R. at 599). She needs to use a cane for walking and can lift or carry with the other arm. (*Id.* at 599, 605). She can frequently climb ramps or stairs, and can frequently balance, stoop, kneel, crouch, or crawl, but can only occasionally climb ladders, ropes, or scaffolds. (*Id.*).

On March 23, 2010, Plaintiff visited family physician Joel Augustin, M.D., complaining of back pain at 5/10, and reported that she had a 20-year history of low back pain. (R. at 618).

A second internal medicine consultative exam was conducted by Peter Bialc, M.D., on June 18, 2010. (R. at 606–10). Dr. Bialc noted that Plaintiff arrived alone by public transportation and was using a cane. (*Id.* at 606–07). Plaintiff related that she had pain in her left knee and long-term problems with her back. (*Id.* at 606). She experienced pain moving from a sitting to a supine position and back. (*Id.* at 607). She had full ranges of motion in her cervical spine, but some limitations in the lumbosacral spine. (*Id.* at 608). Extending the knee was painful, she had some diffi-

culty getting on and off the examination table, and she was unable to walk heel-to-toe. (*Id.* at 608). She displayed shortness of breath on minor exertion. (*Id.* at 609).

Plaintiff received another course of physical therapy, this time for her lower back, from June through August 12 of 2010. (R. at 640–56). She attended 13 appointments and experienced a 75–80% improvement in her symptoms, which were worse in the morning upon waking up, but resolved after she did her exercises. (*Id.* at 643). Her pain-free active range of motion had improved. (*Id.* at 644).

Throughout 2011 and 2012, Plaintiff visited neurologist José Medina, M.D., approximately once a month for treatment of her back and knee pain with medication and injections. (R. at 697–759, 774). In January and February 2011, she reported pain ranging from 4/10 at rest to 6/10 when active. (*Id.* at 747, 752). Dr. Medina noted that an MRI showed "a lot of disk pathology and facet joint pathology" and treated Plaintiff's back with paraveterbal lumbar block. (*Id.* at 747, 749, 752).

At her first hearing before the ALJ on March 28, 2011, Plaintiff reported that she has continued pain in her left knee but not the right, and she has pain in her lower back. (R. at 774–78). She takes Tramadol every day, when she feels a need for it. (*Id.* at 774–76). Her pain level is generally at 5/10 when she wakes up and drops to 2/10 after she takes her medication. She stated that her medication causes her to take naps during the day, though in her later hearing she stated she did not know if she was sleepy from her medication or from eating. (*Id.* at 71, 778–79). She does physical therapy exercises at home three times a day. (*Id.* at 779–80). She testified that she prepares dinner but cannot carry in groceries and can lift only two to three

pounds. (*Id.* at 780–83). She can stand for fifteen to twenty minutes at a time and walk two blocks with her cane or half a block without. (*Id.* at 782). Some days, two or three times a week, the pain is more severe and nauseating, causing her to stay in bed all day. (*Id.* at 783).

On a return visit to Dr. Medina in April 2011, Plaintiff related that the injection from two months earlier had helped only temporarily, and her pain was "climbing back to the degree it was before the injection." (R. at 730, 734–35). Throughout 2011 and 2012, she continued to report pain in her back and knee. (*Id.* at 694, 698, 706, 710, 722, 724, 726). She also related depression, for which Dr. Medina prescribed Paxil starting in August 2011, and fatigue (*Id.* at 694, 710, 724, 726). In February 2012, an electromyogram and nerve conduction test were normal, but her lumbar ranges of motion remained somewhat reduced. (*Id.* at 702, 708). In April 2012, her pain was at 4–5/10 in her legs and knees and 7/10 in her lower back; she walked with the aid of a cane. (*Id.* at 689, 700). In her last visit of record, in October 2012, Plaintiff reported lower back pain, 9/10 at its worst, radiating to her left leg. (*Id.* at 758).

On June 28, 2012, Dr. Medina provided an opinion in connection with Plaintiff's DIB application. (R. at 667). He stated that she can frequently lift up to five pounds; can stand less than one hour and can sit less than two hours in an eight-hour work-day; can frequently stoop or kneel; can frequently perform both fine and gross manipulation with her hands; can never push or pull with her feet; can never climb ramps, stairs, or ladders; can never balance or crawl; and can only occasionally push

or pull or reach with her hands. (*Id.*). He cited Plaintiff's herniated lumbar disc, arthritis in her knees, and sarcoidosis as the source of her limitations, referring to MRI and X-ray results as support. (*Id.* at 668). He opined that cold might worsen her pain, and that she had no communicative, cognitive, or mental limitations of which he was aware. (*Id.* at 667).

In a separate statement about Plaintiff's work-related mental abilities signed the same day, Dr. Medina rated Plaintiff as "excellent," meaning not limited, in 10 of the 12 listed work-related abilities related to remembering and carrying out both simple and complex instructions. (R. at 290). However, he rated Plaintiff as "poor," meaning having no useful ability to function, in her abilities to "complete a normal workday or workweek" and to "perform at a consistent pace." (*Id.*). He cited no clinical findings in support of the above findings. (*Id.*). When asked to rate Plaintiff in 10 abilities related to responding appropriately to supervision, co-workers, and work pressures in a work setting, he rated Plaintiff as "excellent" in all categories. (Id. at 291). In support, he wrote, "I know her for several years (my patient)" (sic). (*Id.*).

## V. DISCUSSION

Plaintiff raises three arguments in support of her request for reversal: (1) the ALJ performed a flawed Listings analysis at step three; (2) the ALJ's credibility determination was patently wrong; and (3) the ALJ arrived at erroneous RFC findings.

### A. Listings Analysis

To assert that she is disabled at step three, a claimant "has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue,* 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990), *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)). Here, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (R. at 21–22). In support of this finding, he noted that there was insufficient evidence to support a listings-level impairment under Listings 1.02 (major dysfunction of a joint), 1.03 (surgery of a major weight-bearing joint, with inability to ambulate effectively for twelve months or more), 1.04 (disorders of the spine), and 3.00 (respiratory disorders). (*Id.*). He also considered the effects of Plaintiff's slight obesity. (*Id.* at 22).

Plaintiff contends that the ALJ did not properly analyze her impairments in combination, and also alleges that the ALJ considered only whether her impairments "meet" a listing, omitting any evaluation of whether her impairments "equal" a listing. (Dkt. 14 at 10; Dkt. 20 at 1–2). However, no applicable listing is identified by Plaintiff in her Memorandum before this court or in either of the Representative Briefs earlier submitted to the ALJ and to the Appeals Council on her behalf. (Dkt. 14 at 10; R. at 281–84). Plaintiff has therefore not explained how all of the criteria of any particular listing are met. *See Ribaudo*, 458 F.3d at 583 (The claimant "has the burden of showing that his impairments meet a listing, and he must show that

his impairments satisfy all of the various criteria specified in the listing.") Nor has she pointed to any medical source opining that her impairments, alone or in combination, meet or medically equal a listing. *Knox*, 327 F. App'x at 655 (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). Plaintiff has therefore failed to meet the required burden to demonstrate that she is disabled at step three.

## B. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[3] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical tes-

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

timony."). Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); see 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Here, the ALJ found that "to the extent that [Plaintiff] alleges her impairments are of disabling severity, she is not fully credible." (R. at 23). He based this in large part on his assessment that treatment records show that Plaintiff's surgeries and physical therapy have been "quite successful" in relieving her pain and increasing

her functionality. (R. at 23). This statement is only partly supported by the medical evidence.

Plaintiff has undergone three courses of physical therapy, one following each knee surgery and one for her lower back pain. (R. at 480–518, 640–56). The record supports the ALJ's finding that Plaintiff's first surgery and subsequent physical therapy were indeed successful in alleviating symptoms in her right knee. (*Id.* at 24, 777). However, the ALJ's broad conclusion about the success of Plaintiff's treatments overlooks significant portions of the record pertaining to her left knee and her back. The ALJ cites Dr. Della Valle's progress notes from April 28, 2009, and July 23, 2009, for the proposition that Plaintiff's recovery from the second knee surgery was "uncomplicated." (*Id.* at 24–25) (citing *id.* at 345, 348). Notably absent is any discussion of the June 2009 note describing warmth and "a small effusion" (accumulation of fluid) in Plaintiff's left knee, which was still causing her pain. (*Id.* at 346). The ALJ also omits mention of a portion of the July note acknowledging that, though Plaintiff was "doing well from a clinical point of view," she was still reporting "numbness and discomfort" in her left knee five months post-surgery. (*Id.* at 348).

Plaintiff's ongoing problems with her left knee were also documented in the two physical consultative examinations, which occurred in February and June 2010. (R. at 594, 606). The ALJ's description of the examiners' reports glides over the distinction between her left and right knee. The ALJ states that Dr. Palacci's report references "bilateral knee pain" and that Dr. Bialc report mentions "some pain in her

knees." (*Id.* at 25–26). However, the words of the examining doctors are notably more specific. Dr. Palacci reported "pain in the left, greater than the right," (*id.* at 593), and Dr. Bialc observed, "the pain is now in the left[,] and because of that, she has a limp when she walks." (*Id.* at 606). The conclusion that her left knee still causes pain is also consistent with Plaintiff's own hearing testimony. (*Id.* at 777).

The ALJ similarly omitted from his credibility analysis any discussion of Plaintiff's complaints of back pain. Records from her neurologist indicate that, despite the improvements she experienced from her third course of physical therapy in 2010 (R. at 640, 643), Plaintiff continued throughout 2011 and 2012 to experience back pain (*see, e.g.*, *id.* at 710, 718, 722, 726, 732), which was relieved only temporarily by injection treatments (*id.* at 732). The ALJ does not explain how this accords with his assessment that her treatments have been successful.

The ALJ's omission of entire lines of evidence describing Plaintiff's ongoing problems with her back and her left knee constituted error. While an ALJ need not discuss or give great weight to every piece of evidence in the record, "he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). He may not "simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ's other stated bases for a poor credibility assessment are also unsupported by the medical evidence. The ALJ stated that Plaintiff's "ability to live and travel independently undermines [her] allegations regarding the severity of her

symptoms." (R. at 24). Yet he did not state which of her claimed symptoms these facts tend to undermine. *Moon*, 763 F.3d at 721 ("ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination."). The ALJ also found Plaintiff not credible because she stated that she had experienced back pain for 20 years, even though she had managed to work during most of that time. (R. at 23). The ALJ noted, "There is no objective showing of significant changes to explain why [Plaintiff] could work with her back pain for many years, but now could not." (*Id.*). A long employment history is not a proper basis to find that a claimant lacks credibility. To the contrary, a lengthy work history often *supports* a claimant's credibility. *Stark v. Colvin,* — F.3d —, No. 15-2352, 2016 WL 698255, at *4 (7th Cir. Feb. 22, 2016) ("[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of disability.") (internal citations omitted). Moreover, the ALJ does not identify any medical evidence indicating that Plaintiff's back condition *hasn't* worsened since she left her job, leaving the ALJ's argument on this point impermissibly grounded in speculation, which is "no substitute for evidence." *White ex rel. Smith v. Apfel,* 67 F. 3d 369, 375 (7th Cir. 1999).

The ALJ also describes "some suggestion in the record that [Plaintiff] was not fully cooperative or motivated to return to work." (R. at 23). This assessment is based in part on Plaintiff's failure to obtain the functional capacity evaluation needed to determine her work status as of June 9, 2009. (*Id.*). Yet, the ALJ never questioned Plaintiff about her reasons for failing to obtain the FCE. This is analogous to

discrediting a claimant for failure to seek treatment without first providing the claimant the opportunity to explain her reasons. *See* SSR 96-7p, at *7; *see generally Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), as amended (Aug. 20, 2014) ("[A]n ALJ may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not… fully comply with prescribed treatment."). On remand, in addition to giving consideration to the full medical record as outlined above, the ALJ must not discredit Plaintiff based on her failure to obtain the FCE without first allowing her to explain that omission.

## C. Residual Functional Capacity

Plaintiff's third argument for reversal or remand is that because the ALJ improperly discounted the two negative findings of Plaintiff's treating neurologist, the ALJ failed to adequately incorporate Plaintiff's mental limitations into his assessment of her RFC. (Dkt. 14 at 12–14). Because the Court is remanding to reevaluate Plaintiff's credibility, the Court chooses not to address this argument. However, on remand, the ALJ shall first determine Plaintiff's credibility and then shall reevaluate Plaintiff's physical and mental RFC considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable rules and regulations.

## VI. CONCLUSION

For the reason's stated above, Plaintiff's Motion for Summary Judgment [13] is **GRANTED** and Defendant's Motion for Summary Judgment [18] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the

case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: March 23, 2016

MARY M. ROWLAND
United States Magistrate Judge